# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

ELIZABETH FEDYNICH and NICOLE
FEDYNICH,

               Plaintiffs,

vs.

SAM STALKFLEET, et al.,

               Defendants.

No.  C23-96-LTS-KEM

**MEMORANDUM
OPINION AND ORDER**

## I.    INTRODUCTION

This matter is before the court on a variety of motions filed by pro se plaintiffs Elizabeth Fedynich and Nicole Fedynich,[1] as well as a motion (Doc. 60) for summary judgment filed by defendants.[2]

## II.    RELEVANT PROCEDURAL HISTORY

This case has a relatively complicated history, which I have discussed in prior orders.  *See, e.g.*, Doc. 38.  I state here what is relevant for consideration of the pending motions.

---

[1] Because both plaintiffs share the same last name, I will refer to them individually by their first names and collectively as "plaintiffs."

[2] The named defendants are Sam Stalkfleet, Trinatee Morrow, Nest Property Management Group LLC, Malory Apartments Owner and 12 Ave SW Nest Property Owner.  However, a second group of defendants (Cedar Terrace Holdings LLC, Ellis Ave, LLC, James St, LLC, Nest Team Investments, LLC and DJC Property, LLC) are also listed on the docket.  This seems to be because plaintiffs previously filed documents that purported to relate to both this case and a separate case (C24-0002-LTS).  The Clerk's office will be directed to strike from the docket the defendants that are not listed in the complaint for this case.

On October 24, 2023, plaintiffs commenced this action by filing a pro se complaint and jury demand (Doc. 1-1) and a motion (Doc. 1) to proceed in forma pauperis. The complaint alleges that the defendants: (1) violated the Fair Housing Act (FHA), (2) violated § 504 of the Rehabilitation Act (RA), (3) violated Iowa Code § 562B.32, (4) violated the Iowa Uniform Residential Landlord and Tenant Law, including Iowa Code §§ 562A.15, 562A.19, 562A.21, 562A.23, 562A.27B and 562A.35, (5) intentionally inflicted emotional and physical distress, (6) breached their contract with plaintiffs, (7) violated plaintiffs' privacy, (8) denied plaintiffs' right to peaceful enjoyment of their property and (9) denied plaintiffs' warranty of habitability. Doc. 1-1 at 1-2.[3]

On November 15, 2023, I granted plaintiffs' motion to proceed in forma pauperis and allowed the following claims to proceed past initial review: (1) failure to provide reasonable accommodations in violation of the FHA, (2) FHA retaliation claims, (3) RA § 504 claims, (4) Iowa Code § 562B.32 claims, (4) Iowa Uniform Residential Landlord and Tenant Law claims, including Iowa Code §§ 562A.15, 562A.19, 562A.21, 562A.23, 562A.27B and 562A.35 claims, (5) breach of contract, (6) violation of privacy, (7) denial of plaintiffs' right to peaceful enjoyment of their property and (8) breach of their warranty of habitability. Doc. 3 at 8-12. I dismissed all other claims and also dismissed defendant Drew Manager, as plaintiffs did not make any claims regarding how Drew Manager violated their rights. *Id.* at 8.

In their answer (Doc. 14), defendants denied many of the allegations set forth in the complaint and asserted two affirmative defenses. *Id.* at 16. Defendants then filed a motion (Doc. 60) for summary judgment, along with a brief (Doc. 63) and amended brief (Doc. 68). Additionally, they filed a statement of undisputed material facts (Doc. 63-1) and an amended version (Doc. 68-1), along with two appendices (Docs. 63-2 and 63-3). Plaintiffs filed a response (Doc. 74) to defendants' statement of undisputed facts and a

---

[3] In addition to the defendants named above (*see supra* n.2), plaintiffs named "Drew Manager" as a defendant in the initial complaint. *See* Doc. 1-1 at 1.

resistance to defendants' summary judgment motion and a "counterclaim" for summary judgment (Doc. 78). The defendants filed a reply (Docs. 81, 82).

Plaintiffs also filed a pro se motion (Doc. 55) to dismiss. Defendants filed a response. Doc. 56. Plaintiffs filed a reply (Doc. 57) and supplement (Doc. 58). Plaintiffs also filed a pro se motion (Doc. 59) for a hearing and a motion (Doc. 70) seeking an expedited ruling on their motion to dismiss and motion for a hearing. Defendants filed a response (Doc. 71) to plaintiffs' motion for an expedited ruling. Finally, plaintiffs filed a pro se motion (Doc. 89) and an amended motion (Doc. 97) to appoint counsel. Defendants filed a resistance (Doc. 92) and plaintiffs filed a reply (Doc. 95).

All of these motions are now fully submitted and ready for decision. Oral argument is not necessary. *See* Local Rule 7(c). For the reasons that follow, plaintiffs' motions (Docs. 55, 59, 70, 78, 89) will be denied and defendants' motion for summary judgment (Doc. 60) will be granted.

### III. RELEVANT FACTS

#### A. Parties

Plaintiffs currently reside in Marion, Iowa, and allege a variety of claims against defendants related to their housing situation while living in the Cedar Rapids, Iowa, area between August and November 2023. As for the named defendants, Nest Property Management (Nest) is a property management company with offices in Coralville, Iowa, and Cedar Rapids, Iowa. Doc. 68-1 at 9, ¶ 27. Nest manages the property located at 2804 O Avenue, N.W., Cedar Rapids, Iowa (Malory Apartments), and the property located at 3620 12th Avenue, S.W., Cedar Rapids, Iowa (Cedar Terrace Apartments). *Id.* at 9-10, ¶¶ 29, 30. Sam Stalkfleet is the Asset Manager of Nest in Cedar Rapids. *Id.* at 9, ¶ 28. Trinatee Morrow is the property manager for the Cedar Terrace Apartments. *Id.* at 10, ¶ 31.

3

## B.    Preliminary Matters

Plaintiffs denied or qualified most paragraphs in defendants' statement of undisputed facts, but frequently provided no citations to the record, thus violating both Fed. R. Civ. P. 56(c) and Local Rule (LR) 56(b).  As contemplated by Fed. R. Civ. P. 56(e)(2) and LR 56(b), I will consider all facts that plaintiffs denied or qualified without proper citations to the record as being undisputed without qualification.  Additionally, plaintiffs did not submit their own statement of facts to accompany their "counterclaim" (Doc. 78) for summary judgment, which also is a violation of the local rules.  Specifically, LR 56(a)(3) requires that a party moving for summary judgment file a "statement of material facts setting forth each material fact as to which the moving party contends there is no genuine issue to be tried, filed as an electronic attachment to the motion under the same docket entry."  Thus, plaintiffs have failed to provide any factual support for their motion for summary judgment.

Additionally, plaintiffs made relevance objections to many of defendants' factual statements.  *See, e.g.*, Doc. 74 at 1-2, 5-6, 8-10.  Relevance objections are generally unnecessary on summary judgment because they are "duplicative of the summary judgment standard itself."  *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) (citations omitted).  The Ninth Circuit has noted that "if evidence submitted on summary judgment could create a genuine dispute of material fact, it is, by definition, 'of consequence in determining the action,' and therefore relevant."  *Id*.  To the extent that I find facts to be material (and therefore relevant), they will be set forth in the fact section below.

Plaintiffs also make a variety of legal objections to defendants' statement of facts.  *See, e.g.*, Doc. 74 at 17-18, 20-21, 29.  The statement of facts is not the proper venue for such objections and they are therefore overruled.  *See, e.g., Northwest Bank & Tr. Co. v. First Ill. Nat'l. Bank*, 354 F.3d 721, 725 (8th Cir. 2003) (affirming the district court's finding that plaintiffs' filings were "replete with conclusory allegations and legal argument, obfuscating any concise and specific statements of material fact").

4

Finally, plaintiffs frequently object to defendants' statement of facts by claiming that defendants did not disclose materials during discovery, or disclosed items after the discovery deadline passed. *See, e.g.*, Doc. 74 at 23, 32, 43. Plaintiffs offer no support for theses alleged violations. Indeed, defendants note that plaintiffs did not send them any discovery requests. *See, e.g.*, Doc. 81-1 at 9. In any case, LR 37(c) requires that motions to compel discovery be filed within 14 days after the discovery deadline, which was October 11, 2024. Doc. 19 at 2. Thus, any arguments that defendants failed to comply with their discovery obligations in this case should have been raised and litigated long ago. Plaintiffs' discovery-related objections are untimely and overruled.

## C. Facts

### 1. Plaintiffs' Health Conditions

Plaintiffs contend that they have a variety of medical conditions. *See* Doc. 3 at 5-6. Indeed, in their opposition to defendants' statement of facts, plaintiffs contend that they "are considered disabled in accordance with all Federal laws." Doc. 74 at 9, ¶ 17. However, the only evidence offered regarding plaintiffs' medical conditions are two medical accommodation letters. *See* Doc. 63-3 at 109-10. Both letters were written by Robert Linnell, PA-C at the University of Iowa on August 14, 2024. The first states that Elizabeth "has a history of Cushing's disease and a sleep disorder and with this she has difficulty waking up and functioning well in the mornings." *Id.* at 109. The second states that Nicole "has had some complications from Covid which has affected her cognitive abilities." *Id.* at 110.

### 2. Unit 2804-24

On September 5, 2023, plaintiffs completed an online rental application for unit 1606-1, a first-floor, 2 bedroom, 1.5-bathroom apartment at Malory Apartments – a Nest

5

property.  Doc. 68-1 at 12, ¶ 49.  However, the apartment was unavailable, as another party had applied for the unit and paid the required security deposit in late August 2023.  *Id.* at 12-13, ¶ 50.  Plaintiffs requested to move into an available unit on September 6, 2023.  *Id.* at 13, ¶ 52.  That was not possible, as Nest had to ensure that Waypoint Services[4] (Waypoint) completed the required paperwork because Waypoint was paying plaintiffs' deposit and first month's rent.  *Id.*  Nest only had third-floor units available for move-in on September 7, 2023, to which plaintiffs were agreeable (although they preferred a first-floor unit) because of their immediate need to move.  *Id.* at ¶ 53.  On September 6, 2023, plaintiffs' assigned Waypoint caseworker, Maya Simms, inspected Unit 2804-24 and found no deficiencies.  Doc. 63-3 at 25-26.  On September 7, 2023, plaintiffs signed their lease and moved into Unit 2804-24.  Doc. 68-1 at 14, ¶ 56.

### a.  *Complaints and Apartment Tours*

On September 8, 2023, one day after moving into Unit 2804-24, plaintiffs texted and emailed Stalkfleet claiming their neighbors were smoking and that they smelled mold in their unit.  Doc. 68-1 at 15, ¶ 62.  They inquired about touring other units and asked Nest to install fresh air sensors in the building.  *Id.*; *see also* Doc. 63-2 at 9, ¶ 26.  Stalkfleet offered to show them alterative apartments on September 11, 2023.  Doc. 63-2 at 9, ¶ 27.  Plaintiffs said they did not want to move out and requested that Stalkfleet enforce the no smoking policy and remediate the mold in their apartment.  *Id.* at 101.

Nonetheless, plaintiffs toured three units at Malory Apartments on September 11, 2023, with Stalkfleet and Simms.  Doc. 68-1 at 16-17, ¶ 66.  Plaintiffs claimed that all three apartments smelled like smoke.  Doc. 63-2 at 10, ¶ 30.  After Stalkfleet and Simms

---

[4] "Waypoint focuses funding primarily on rapidly rehousing those households that qualify as HUD category 1 Homeless (literally homeless).  As funding allows, Waypoint will target households at imminent risk of homelessness (HUD Category 2 and 4) to prevent households from entering homelessness unnecessarily. . . ."  Doc. 63-3 at 13.  Additionally, "Waypoint uses Housing Assistance Program funds to support rental assistance, security deposits, utility deposits and utility payments for qualifying households."  *Id.* at 14.

disagreed with plaintiffs as they did not smell any smoke, plaintiffs called Stalkfleet a "horrible person, a liar" and said, "his mother did not raise [him] right and that she raised a despicable person." *Id.* at 10-11, ¶ 31. When Simms tried to intervene, plaintiffs called her incompetent and accused her of enabling Stalkfleet's behavior. *Id.* Stalkfleet then agreed to plaintiffs' proposal for them to remain in Unit 2804-24 until September 30, 2023, while they looked for alternative housing options. *Id.* at 102, 105-06. Stalkfleet stated that if the unit was vacated on or before September 30, 2023, with no damage, plaintiffs would receive their full security deposit and would not have to pay the lease break fee. *Id.* at 105-06. Plaintiffs scheduled a tour at Cedar Terrace Apartments on September 12, 2023, but they did not appear on that date. *Id.* at 11, ¶ 33.

On September 12, 2023, Stalkfleet informed plaintiffs that he reminded all occupants that smoking inside was prohibited. *Id.* at 106. Because many of plaintiffs' smoke complaints focused on their neighbors – Issac Djanashvili and Cheri Holt (*see id.* at 104-08) – Stalkfleet reached out to Djanashvili on September 12, 2023, via text and phone call reminding him to go outside to smoke. *Id.* at 11, ¶ 34. On September 13, 2023, Stalkfleet inspected Djanashvili's unit and found no indications that he was smoking in his apartment. *Id.* at 12, ¶ 35. Stalkfleet found no smoke damage to the walls or blinds, nor did he smell smoke in the unit.[5] Stalkfleet then inspected Holt's unit and found no signs of smoking. *Id.* at ¶ 36. Additionally, Elizabeth told Stalkfleet that neighbor Jim McCormick was smoking on his balcony. Doc. 68-1 at 22, ¶ 77. Nest issued a notice of non-compliance to McCormick on October 7, 2023. Doc. 63-2 at 74.

On September 15, 2023, Stalkfleet showed plaintiffs three other units in the Malory Apartments complex. First, he showed them a unit on the floor beneath plaintiffs (2804-15). Elizabeth requested for the window to be opened as she thought it smelled like smoke and hoped fresh air would help alleviate the issue; this was done. Doc. 68-1

---

[5] Plaintiffs contend that this is a conclusory statement as no testing for tobacco or nicotine was done. Doc. 74 at 31. However, Stalkfleet's stated observations are admissible, regardless of whether plaintiffs agree or think they are relevant.

at 19, ¶ 73.  Next, he showed plaintiffs a first-floor unit, which was not yet ready for occupancy.  Elizabeth said they would consider this unit.  *Id.*  Finally, Stalkfleet showed them a third-floor unit (1606-9) with the same layout as plaintiffs' current apartment.  *Id.* at 20-21, ¶ 75.  Both Elizabeth and Stalkfleet thought the apartment smelled odd and Elizabeth asked to open the windows.  Stalkfleet did so and instructed Nest's Maintenance Supervisor Doug Hale to put an ozone air purifying machine in the unit.  Doc. 63-2 at 13-14, ¶ 39.

Stalkfleet told plaintiffs that they could meet on September 18, 2023, so they could look at units 2804-15 and 1606-9 again after they had been aired out.  Doc. 68-1 at 21, ¶ 76.  Stalkfleet sent plaintiffs three text messages on September 18 and 19, 2023, trying to arrange a time to meet.  They did not respond to any of Stalkfleet's messages.  Doc. 68-1 at 22, ¶ 78.  On September 19, 2023, Elizabeth emailed Stalkfleet with the subject line "Lawsuit" stating their intention to file a "federal housing lawsuit against [Stalkfleet] and Nest property management."  Doc. 63-2 at 121-23.  That same day, Stalkfleet offered plaintiffs to extend their move-out to October 21, 2023, to allow them to find alternative housing.  Doc. 68-1 at 22, ¶ 79.

### b.    *Law Enforcement Contacts*

Plaintiffs called the Cedar Rapids Police Department (CRPD) on September 10, 2023, at 3:39 a.m., September 14, 2023, at 12:54 p.m., and September 17, 2023, at 3:21 a.m. to report marijuana or chemical smells coming from either Djanashvili or Holt's apartment.  Doc. 68-1 at 22-24.  All three reports were responded to and investigated by the CRPD, which found no evidence to substantiate any of plaintiffs' claims.  *Id.*

### c.    *Mold Tests*

On September 13, 2023, Elizabeth requested that Nest order a mold test for the plaintiffs' unit.  Doc. 68-1 at 24, ¶ 88.  On September 15, 2023, Stalkfleet and Nest Maintenance Supervisor Doug Hale inspected plaintiffs' kitchen sink, bathroom sink and

8

the area behind the dishwasher. Doc. 63-2 at 14, ¶ 40. They did not see any "signs of mold, active leaks, previous leaks, or any sort of water damage in the areas the Fedynichs claimed to smell mold." *Id.* Hale and Stalkfleet thought the air conditioner filter looked dirty and needed to be cleaned. Elizabeth was adamant that it was mold and requested a new air conditioner.[6] *Id.*

Pursuant to Elizabeth's initial request for a mold test, Nest scheduled Alliance Environmental Services (AES) to investigate plaintiffs' unit on September 28, 2023. Doc. 68-1 at 24-25, ¶ 89. Stalkfleet posted an inspection notice on plaintiffs' door on September 26, 2023, notifying them that the inspection would take place on September 28, 2023. *Id.*; Doc. 63-2 at 71. Plaintiffs informed Stalkfleet that the time would not work for them because they had appointments. Doc. 68-1 at 24, ¶ 89; Doc. 74 at 35-36.

On September 28, 2023, plaintiffs refused to allow AES' Certified Indoor Environmental Consultant, Jamie Papian, to enter their unit for the scheduled inspection. Doc. 68-1 at 25, ¶ 90. Stalkfleet knocked on plaintiffs' door and Elizabeth denied them access to her unit. *See id.* at ¶ 91 (Stalkfleet asked Elizabeth, "Are you denying us access to your unit today?" Elizabeth responded, "yes I am."). Following this, Stalkfleet and Papian left the property. *Id.* Nest issued plaintiffs a lease violation on September 28, 2023, for denying Nest entry into their unit and for repeated harassment of their neighbors. *Id.* at 26, ¶ 93; Doc. 63-2 at 72. Upon receipt of the lease violation, plaintiffs claimed that Nest was retaliating, harassing, intimidating, interfering with their housing rights, creating a hostile environment, refusing to grant reasonable accommodations, discriminating and violating other housing and civil rights laws. They again requested to be transferred to a different unit. Doc. 68-1 at 27, ¶ 94.

### d.    *Letter Posting*

---

[6] On October 5, 2023, Linn County Public Health conducted a Healthy Homes Assessment of Unit 2804-24 pursuant to plaintiffs' request. Doc. 68-1 at 27-28. It found that plaintiffs' air conditioner was full of dirt and dried mold. Doc. 63-3 at 4-5.

9

On October 12, 2023, Malory Apartment tenant Joyce Miller called Stalkfleet to report that a letter had been posted on her door. Doc. 68-1 at 38, ¶ 133. The letter was addressed to "Tenants of Malory Apartments Nest Property Cedar Rapids Iowa" and indicated it was written by a person named "Ann." Nest employees Katie Lippincott and Trinatee Morrow called the phone number "Ann" had listed on the letter. "Ann" was, in fact, Elizabeth. *Id.*

The letter, which plaintiffs taped on every apartment door at Malory Apartments, stated:

> Dear Tenants of Malory Apartments Nest Property Cedar Rapids Iowa,
>
> I am a resident who is being forced to move out of my unit because of ongoing cigarette, marijuana smoke and mold. If any of you are suffering from asthma or breathing problems from secondhand smoke or mold please contact me at [phone number]. Ann. And for those of you who smoke inside please stop. You're making your neighbors sick. But even you may have a defense if management tries to evict you for smoking inside. I'm not a lawyer and this is not legal advice. But my neighbors who just now smoked on the side of the building said Sam said it was ok. It's not. . . Bottom line is he can't enforce part of the lease regarding smoking and then let you break a different part of the same lease. Consult a lawyer if you have received a lease violation for smoking.
>
> Nest needs to make up their mind about smoking. Allow smoking or not but if they don't allow it they need to enforce it 100%. Fresh Air Sensors are a product designed to detect cigarette and marijuana smoke in apartments. They are not that expensive. Only $100.00 each. But Nest property doesn't want to spend the money to protect your lungs. . . And reporting the smell of cigarettes to management has been completely useless. They don't listen at all. My neighbor had some kind of device he used to hide the smell of cigarettes in his apartment. I smelled them in mine but he was able to hide it in his and he lived right below me.
>
> Lastly, contact Ruby with Linn County Health Department. She will come and do an inspection of your unit and determine if you have mold or secondhand smoke. Keep an object like a towel somewhere the smoke enters your unit like under a sink so you can have her smell it when she come[s] out to inspect it.

Doc. 63-3 at 7.

### 3. Unit E1

Plaintiffs amended their lease on October 10, 2023, to transfer to Unit E1 at Cedar Terrace Apartments (3620 12th Ave SW Cedar Rapids). Doc. 63-2 at 64-65. Plaintiffs acknowledge that "Defendant Morrow did say there was a cockroach problem" in Unit E1. Doc. 4 at 13.

On October 11, 2023, plaintiffs inspected the unit with Erica Zito, their new Waypoint caseworker. Plaintiffs "did not see any visual evidence of cockroaches when they viewed the apartment." Doc. 68-1 at 30, at ¶ 106; Doc. 4 at 14. Nonetheless, the move-in check list completed by plaintiffs and Zito noted that the parties found a cockroach in the kitchen cabinet and that there were some scuffmarks on the wood. Doc. 63-3 at 28-31. Stalkfleet instructed the Nest Maintenance team to put a few roach traps in the unit. Doc. 68-1 at 30, ¶ 105. Plaintiffs signed off on the condition of Unit E1 and inhabited the apartment. *Id.*

On October 11, 2023, Stalkfleet texted Elizabeth to ask when they would be turning in their keys for Unit 2804-24. Doc. 68-1 at 30-31, ¶ 112. Elizabeth sent Stalkfleet an email stating, in part:

> You are a vile and despicable corrupt 'asset manager'.
> I do not know when you will get your keys back. I guess it depends on how badly the indoor smoking affects us. . .
> Your soulless narcissistic self doesn't care about anything that inconveniences you. You despicable monster.
> You are so disgusting of a person there are truly no words to describe how rotten to the core of your non existent soul you truly are.
> You have done nothing but harm us, lie to us, gaslight us, and make us sick.
> We will give you the keys when we are done.

Doc. 63-2 at 156.

On October 14, 15 and 16, 2023, Elizabeth sent Morrow numerous emails regarding roach issues, maintenance requests, air purifiers and requests to see different units. Doc. 68-1 at 32, ¶ 114(1)-(2).[7] They claimed the roach treatments were ineffective and recommended alternative treatments. They also claimed that people in the unit above them were smoking in their apartment. However, that unit was unoccupied. *Id.* at ¶ 114(1). Additionally, plaintiffs asked to look at all units listed on Nest's website. At that time, all the units listed had either been rented or were significantly out of their price range. *Id.* at 114(2).

Plaintiffs continued to complain to Nest, local authorities and prospective tenants about the cockroach situation. On October 17, 2023, plaintiffs sent Nest eight pictures of Unit E1, with some showing roaches.[8] *Id.* at 33, ¶ 115. Plaintiffs stated they would not be moving out of Unit 2804-24 after all, as Unit E1 was cockroach infested. *Id.* at ¶ 116. On October 18, 2023, Brian Hornung, Nest Cedar Rapids Housing Inspector, contacted Morrow and Stalkfleet after receiving a cockroach complaint from Elizabeth. Stalkfleet told Hornung that Nest was actively and aggressively treating for roaches in the building and that Nest was treating plaintiffs' unit, but plaintiffs asked them to stop. *Id.* at 35, ¶ 125. On October 25, 2023, Hornung contacted Nest again regarding another complaint from Elizabeth. Stalkfleet reinformed Hornung about Nest's previous treatments and stated that he would coordinate with Nest's pest control vendor about possible alternative treatment options. *Id.* at ¶ 126.

On November 7, 2023, while a prospective tenant toured a unit at Cedar Terrace Apartments, plaintiffs placed a note on her vehicle. The note stated, "This place is full

---

[7] Defendants' statement of facts has a scrivener's error as they included two paragraphs numbered as 114. *See* Doc. 68-1 at 32. I will indicate which one I am referring to with a (1) or (2).

[8] Defendants claim that the photos show three different roaches. Doc. 68-1 at 33. Plaintiffs argue that defendants are not experts on photographs or insects but do not allege how many roaches they saw. Doc. 74 at 43. Based on defendants' specific uncontested statements, I find that the photos show up to five roaches.

of cockroaches. Don't rent here. They are racist against black people. Go anywhere else not here." *Id.* at 39, ¶ 138.

Plaintiffs also stopped paying rent for Unit E1. On November 6, 2023, Nest sent plaintiffs a "Notice of Non-Payment of Rent, Notice to Quit, and Notice of Termination of Lease Agreement" with respect to Unit E1. Doc. 63-3 at 98. On January 3, 2023, Nest filed a notice of default in the Iowa District Court as plaintiffs breached their agreement with Nest to fully vacate Unit E1 by January 2, 2023. *Id.* at 101-02.

### 4. *Failure to Vacate Unit 2804-24*

Plaintiffs did not vacate Unit 2804-21 after they amended their lease and moved into Unit E1 at Cedar Terrace Apartments on October 11, 2023. Doc. 63-2 at 28, ¶ 81, 82. On November 17, 2023, Nest filed a Forcible Entry and Detainer action against plaintiffs for holding over and refusing to vacate. Doc. 63-3 at 91-93. On November 6, 2023, an Iowa District Court magistrate judge ordered plaintiffs to be removed from Unit 2804-24. *Id.* at 94. Plaintiffs appealed the order; it was affirmed on January 31, 2024. *See id.* at 107 (finding that "Defendants simply have failed to offer any specific evidence to show retaliatory behavior."). The Iowa Supreme Court denied further review. *See* Doc. 63-2 at 30, ¶ 89.

### 5. *Waypoint Services Termination*

Plaintiffs entered into a Housing and Homeless Services Financial Assistance Program Agreement with Waypoint on August 11, 2023. Doc. 68-1 at 5, ¶ 11. On October 13, 2023, Nest informed Waypoint's J'nae Peterman of the ongoing harassment from plaintiffs and stated that they would need to "stop working with Waypoint if this situation is not resolved in a timely manner." *Id.* at 35, ¶ 127. Nest informed Waypoint of the following challenges posed by plaintiffs:

- harassment of neighbors
  - including baseless calls to the police, delivering letters, taking

13

pictures of neighbors, verbal altercations in the middle of the night
- o verbal altercations including threatening to call DHS and CPS on their neighbors related to their baseless claims. Also includes verbal altercations with police officers on property
- harassment of nest property management employees
  - o continued harassment via email, phone calls, texts and in person. Including berating and defaming employees, recording conversations without permission, aggressively pursuing employees on property
- denial of entry to unit for inspection
  - o violated lease by denying owner access to the unit despite providing more than 24 hour written notice. . .
- refusal to turn in keys for unit
  - o resident intentionally holding over previous unit by keeping their dogs there and have refused to turn in keys in a timely manner

Doc. 63-2 at 24-25, ¶ 67.

On October 17, 2023, plaintiffs' participation in Waypoint's Rapid Rehousing Program was terminated for repeated harassment of on-site administrative and maintenance staff, falsely accusing neighbors of lease violations, falsely reporting a mold outbreak within the complex, requesting a new unit and refusing to move on their set move-in date. Doc. 63-3 at 34. Plaintiffs appealed the termination but their appeal was denied on October 27, 2023. *Id.* at 39.

## IV.   APPLICABLE STANDARDS

### A.   *Summary Judgment*

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

14

A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

"An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. The party moving for entry of summary judgment bears "the initial responsibility of informing the [] court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex Corp.*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

15

In determining if there is a genuine issue of material fact, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

## B. Motion to Dismiss Voluntarily

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A), a plaintiff is permitted to dismiss an action without a court order by filing "a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment" or by "a stipulation of dismissal signed by all parties who have appeared." Fed. R. Civ. P. 41(a)(1)(A). After a defendant files an answer, the action can be dismissed "only by court order, on terms the court considers proper." *Graham v. Mentor Worldwide LLC*, 998 F.3d 800, 804 (8th Cir. 2021) (quoting Fed. R. Civ. P. 41(a)(1)(A)(i), (a)(2)). The court should consider:

> whether the party has presented a proper explanation for its desire to dismiss; whether a dismissal would result in a waste of judicial time and effort; and whether a dismissal will prejudice the defendant. Likewise, a party is not permitted to dismiss merely to escape an adverse decision nor to seek a more favorable forum.

*Graham*, 998 F.3d at 804-05 (quoting *Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 950 (8th Cir. 1999)) (cleaned up); *see also Mullen v. Heinkel Filtering Sys., Inc.*, 770 F.3d 724, 728 (8th Cir. 2014) (same).

## C. Motion to Appoint Counsel

Under 28 U.S.C. § 1915(e)(1) "[t]he court may request an attorney to represent any person unable to afford counsel." However, "[a] pro se litigant has no statutory or constitutional right to have counsel appointed in a civil case." *Stevens v. Redwing*, 146 F.3d 538, 546 (8th Cir. 1998). "The [district] court has a good deal of discretion to determine whether representation is warranted given the nature of the case and the litigants." *Chambers v. Pennycook*, 641 F.3d 898, 909 (8th Cir. 2011).

> The relevant criteria for determining whether counsel should be appointed include the factual complexity of the issues, the ability of the indigent person to investigate the facts, the existence of conflicting testimony, the ability of the indigent person to present the claims, and the complexity of the legal arguments.

*Patterson v. Kelley*, 902 F.3d 845, 850 (8th Cir. 2018) (quoting *Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 794 (8th Cir. 2006)). These factors are not exclusive, and the court may consider other issues. *Crozier for A.C. v. Westside Cmty. Sch. Dist.*, 973 F.3d 882, 891 (8th Cir. 2020) (reversing the district court's denial of a motion to appoint counsel after finding that the plaintiff presented "a serious claim" and the "the case otherwise cannot proceed to a timely decision on the merits" without the assistance of counsel).

# V. DISCUSSION

## A. Defendants' Motion for Summary Judgment

### 1. The Parties' Arguments[9]

Defendants argue that plaintiffs have failed to raise any genuine disputes of material fact such that summary judgment is appropriate. Regarding plaintiffs' FHA reasonable accommodation claims, defendants contend that plaintiffs do not have a qualifying disability and, in any case, there is no nexus between their disability and their

---

[9] Plaintiffs' complaint is a 27-page narrative and their opposition to defendants' motion for summary judgment is a 51-page narrative with almost no citations to the record or applicable caselaw. I have made a reasonable attempt to parse their arguments.

17

requested accommodations. Doc. 68 at 10. They further contend that plaintiffs did not show their requested accommodations were necessary or reasonable. *Id.* at 13. Regarding plaintiffs' retaliation claim, defendants contend that plaintiffs did not form a tenant's union and the lease notice violation was not retaliatory. *Id.* at 15-19. Moreover, they argue that plaintiffs waived all claims related to Unit E1. *Id.* at 23. Finally, defendants assert that plaintiffs have not produced evidence to support their state law claims. *Id.* at 23-25.

Plaintiffs counter that they are disabled and that their reasonable accommodation claims were unlawfully denied. Doc. 78 at 22, 24-25. They also contend that they tried to form a tenants' union and Nest retaliated against them by issuing a lease violation notice. *Id.* at 29. Moreover, they assert that they did not waive their rights regarding the Cedar Terrace Apartment as they "never took legal possession of" it. *Id.* at 40. Finally, plaintiffs contend that the record supports their state law claims. *Id.* at 41.

### 2. *Analysis*

#### a. *FHA – Reasonable Accommodations*

The Fair Housing Act (FHA), 42 U.S.C. § 3601, *et seq.*, provides civil remedies for discrimination. The FHA forbids discrimination "in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter" and "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling" "because of a handicap of" the prospective buyer or renter, a person residing in or intending to reside in the dwelling, or any person associated with the buyer or renter. 42 U.S.C. § 3604(f)(1) & (f)(2). The FHA requires:

> an accommodation for persons with handicaps if the accommodation is (1) reasonable and (2) necessary (3) to afford handicapped persons equal opportunity to use and enjoy housing. Because the FHA's text evidences no intent to alter normal burdens, the plaintiff bears the burden of proving each of these three elements by a preponderance of the evidence.

18

*One Love Hous., LLC v. City of Anoka, Minn.*, 93 F.4th 424, 429 (8th Cir. 2024) (quotations omitted) (citations omitted). Additionally, a plaintiff "must allege some nexus between the accommodation she sought and her disability." *Hunter v. Anderson*, No. 12-cv-2008, 2013 WL 3974342, at *11 (D. Minn. July 31, 2013) (quotations omitted), *aff'd*, 563 Fed. App'x 508 (8th Cir. 2014).

### 1. *Handicap Determination*

As an initial matter, plaintiffs must establish that they are handicapped within the meaning of the FHA. The FHA defines handicapped, "with respect to a person" as: "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h).

Plaintiffs assert that they have a host of medical conditions. As I noted in my initial review order:

> The Fedynichs assert that they are both disabled persons "under HUD and the Americans with Disabilities Act." Doc. 1-1 at 2-3. They contend that Elizabeth Fedynich began receiving Social Security disability benefits based on her diagnosis of depression, post-traumatic stress disorder and anxiety. *Id.* at 3. They assert she also has a back injury, asthma, diabetes, Cushing's disease, gout, gastroparesis, a heart condition, high blood pressure, blood clots, sleep apnea, multiple chemical sensitivity and recent concussions. *Id.* at 3-4. They contend that Nicole Fedynich receives Social Security disability payments based on chronic autoimmune diseases, including "pancreatitis, ulcerative colitis/[C]rohn's disease, lupus, chronic kidney disease, [E]hlers-[D]anlos, inappropriate sinus tachycardia, and pleurisy." *Id.* at 4. They assert she also has asthma, sleep apnea, multiple chemical sensitivities, adrenal insufficiency, concussions, post-traumatic stress disorder, depression and anxiety. *Id.* at 4-5.

Doc. 3 at 5-6.

Individuals who receive Social Security disability benefits usually qualify as disabled under the FHA. *See Sinisgallo v. Town of Islip Hous. Auth.*, 865 F.Supp.2d

19

307, 338 (E.D.N.Y. 2012) ("[I]n most cases, individuals who meet the definition of disability for purposes of receiving SSI or SSDI benefits also qualify as disabled under the federal disability statutes."). Here, however, plaintiffs did not provide any evidence or documentation of these alleged conditions, which makes it impossible for me to find them disabled under FHA standards. *Cf. id.* (finding plaintiffs likely to be successful in proving they are disabled when they provided affidavits attesting to their disabilities, letters from social workers and defendants did not dispute that they receive Social Security disability payments). While medical evidence is not required, plaintiffs must put forward more than mere conclusory assertions. *See Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 44 (2d Cir. 2015) ("[C]onclusory declarations are insufficient to raise a question of material fact. Non-medical evidence that conveys, in detail, the substantially limiting nature of an impairment may be sufficient to survive summary judgment.") (citation omitted); *see also Celotex Corp.*, 477 U.S. at 323 ("[T]here can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.") (citation omitted).

Additionally, plaintiffs appear to allege that their reasonable accommodation requests relate to asthma and chemical sensitives[10] (*see infra* Section V.A.2a.2), yet they admit that they do not receive Social Security disability benefits for these conditions. *See* Doc. 4 at 3-4 (noting that Elizabeth developed asthma after she qualified to receive disability payments and stating that Nicole receives disability payments because of her autoimmune diseases). Even if plaintiffs provided sufficient evidence to show that they received disability income for certain conditions, receiving income for one condition does

---

[10] Plaintiffs stated they "have asthma and the ongoing environmental triggers were having a severe affect [sic] on both Plaintiffs health." Doc. 78 at 11; *see also id.* at 9 (noting that plaintiffs experienced "severe asthma symptoms" because of the smoke in the building). Additionally, plaintiffs note that their chemical sensitivities were the reason they asked Morrow to order screens and use an alternative insecticide. *Id.* at 12.

not automatically qualify a person as handicapped under the FHA for a different condition. *See, e.g.*, *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 604 (4th Cir. 1997) ("The FHA does not require accommodations that increase a benefit to a handicapped person above that provided to a nonhandicapped person with respect to matters unrelated to the handicap."); *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1226 (11th Cir. 2008) ("If accommodations go beyond addressing these needs and start addressing problems not caused by a person's handicap, then the handicapped person would receive not an 'equal,' but rather a better opportunity to use and enjoy a dwelling, a preference that the plain language of this statute cannot support.").

Asthma and chemical sensitivities can qualify as physical impairments. *See Hunt v. St. Peter Sch.*, 963 F. Supp. 843, 850 (W.D. Mo. 1997) ("A physical impairment includes a condition which affects a person's respiratory system.") (citing 7 C.F.R. § 15b.3(j) and 34 C.F.R. § 104.3(j)(2)(I)(A)). However, "[w]here asthma is the alleged handicap, courts must assess whether the specific facts alleged support the conclusion that [] asthma substantially limits a person's major life activities." *Ricketts v. Westwood Condo Assoc.*, No. 23-CV-01079 (SVN), 2025 WL 969547, at *8 (D. Conn. Mar. 31, 2025). The same determination must be made regarding alleged chemical sensitivities. *See Matarese v. Archstone Pentagon City*, 795 F. Supp. 2d 402, 432-33 (E.D. Va. 2011), *aff'd in part, vacated in part sub nom.*, *Matarese v. Archstone Communities, LLC*, 468 F. App'x 283 (4th Cir. 2012).

Plaintiffs suggest that the major life activity of breathing is impaired by their asthma and chemical sensitivities. Doc. 78 at 21 (noting that plaintiffs record of disabilities affect "breathing, sleeping, walking, etc."); *see also id.* at 10 ("Breathing is listed under HUD as a major life activity. Ongoing secondhand cigarette smoke exposure hinders that life activity."). However, they provide no evidence of this. Although the Eighth Circuit has not explicitly considered the meaning of "substantially limited in a major life activity" in the FHA context, courts often use pre-2008 ADA decisions as a

guide.[11]  *See Rodriguez*, 788 F.3d at 40 n.10.  The Eighth Circuit has stated that under the ADA:

> Several factors are considered in determining whether a person is substantially limited in a major life activity: (1) the nature and severity of the impairment; (2) its duration or anticipated duration; and (3) its long-term impact.

*Taylor v. Nimock's Oil Co.*, 214 F.3d 957, 960 (8th Cir. 2000) (citing 29 C.F.R. § 1630.2(j)(2)(i)–(iii)).

Plaintiffs provided no affidavits or medical records showing that they suffer from asthma and chemical sensitivities.  Nor did they offer any evidence or arguments regarding the nature and severity of the impairments, their duration or long-term impact. *Cf. Hunt*, 963 F. Supp. at 850 (finding plaintiffs' asthma qualified her as a handicapped individual under the RA where "[h]er doctor identifies her illness as life threatening," and she provided evidence that "[s]he has been hospitalized repeatedly due to the severity of her attacks" and "must continually take medication and treatments for her condition"); *see also Matarese*, 795 F. Supp. 2d at 433 (finding that plaintiff did not establish that her chemical sensitivities "rise[] to the level of handicap because [she has] not demonstrated that these chemical sensitivities substantially limit her breathing").

The only evidence plaintiffs submitted regarding their medical conditions are two medical accommodation letters.  *See* Doc. 63-3 at 109-10.  Both letters were written by Robert Linnell, PA-C, at the University of Iowa on June 14, 2024.  The first letter stated that Elizabeth "has a history of Cushing's disease and a sleep disorder and with this she has difficulty waking up and functioning well in the mornings." *Id.* at 109.  The second

---

[11] The ADA's definition of disability was virtually identical to the FHA's definition of handicap prior to the 2008 amendments.  However, Congress amended the ADA and its definition of disability in 2008.  *See* ADAAA, § 4, 122 Stat. 3553, 3555–57 (2008).  As the FHA was not similarly amended, courts use pre-ADAA cases to guide their FHA interpretation.  *Rodriguez*, 788 F.3d at 40 n.10 (citing *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1288 (11th Cir. 2014); *see also Brooker v. Altoona Hous. Auth.*, No. 11–cv–95, 2013 WL 2896814, at *9 n.8 (W.D. Pa. June 12, 2013) (same).

letter states that Nicole "has had some complications from Covid which has affected her cognitive abilities." *Id.* at 110. Plaintiffs contend that these letters are not a comprehensive list of all their disabilities, as they assert that the letters merely sought to explain why appearing for a deposition early in the morning would be difficult. Doc. 74 at 12, ¶ 22. However, they do not provide any further evidence of their conditions.

For these reasons, plaintiffs have failed as a matter of law to show that they are handicapped as defined by the FHA. *See Fedynich v. Boulder Hous. Partners*, No. 3:20-cv-165, 2020 WL 5371352, at *8 (E.D. Va. Sept. 8, 2020), *aff'd*, No. 20-2082, 2023 WL 1814208 (4th Cir. Feb. 8, 2023) ("[T]o state a claim under the FHA, a plaintiff must do more than label herself as disabled.").

### 2. *Reasonable Accommodations*

Even if plaintiffs met the FHA definition of handicapped, they would have to show a genuine issue of material fact regarding defendants' failure to provide reasonable accommodations. They have not done so. Plaintiffs assert that they made the following reasonable accommodation requests: in Unit 2804-24, they asked defendants to purchase and install fresh air sensors, enforce the no smoking policy, conduct a mold test, move them to a first-floor unit or another apartment and require tenants to smoke 25 feet from the building. Doc. 78 at 9-12; *see also* Doc. 63-2 at 9 *and* Doc. 68-1 at 24. Additionally, in Unit E1, they asked for expedited window screens, requested defendants switch pest control products, asked to be transferred to a new unit and then back to their old apartment, requested the cleaning and disinfection of their central air unit and the installation of fresh air sensor products. Doc. 78 at 12-13, 15-17.

I will first address plaintiffs' requests as they relate to Unit 2804-24. As an initial matter, plaintiffs failed to show that defendants denied many of their requests. A plaintiff's claims for failure to provide reasonable accommodations cannot succeed if defendants granted the requests. *See Groteboer v. Eyota Econ. Dev. Auth.*, 724 F. Supp. 2d 1018, 1025 (D. Minn. 2010) (holding that plaintiff's "claim fails because she cannot

23

prove that Defendants denied her requests"). The undisputed facts show that defendants enforced the no smoking policy and the requirement that tenants smoke 25 feet from the building. Stalkfleet messaged the building occupants reminding them that smoking inside is prohibited. Doc. 63-2 at 106. Stalkfleet also reminded plaintiffs' neighbors to smoke outside, inspected the neighbors' units and found no evidence that they were smoking. *Id.* at 11-12, ¶¶ 34-36. Additionally, following Elizabeth's complaint, Nest issued another neighbor a notice of non-compliance for smoking on his balcony. *Id.* at 74. Plaintiffs' contention that the no smoking policy "[w]as never enforced" is not supported by the summary judgment record. Doc. 78 at 24.

Defendants also heeded plaintiffs' request for a mold test. Doc. 68-1 at 24, ¶ 88. Stalkfleet and Hale inspected their unit and found no signs of mold. Doc. 63-2 at 14. Nest then scheduled AES to inspect their unit for mold, but plaintiffs refused to allow the inspector in. Doc. 68-1 at 25, ¶ 90. Plaintiffs' refusal to permit entry into their unit thwarted defendants' attempts to conduct the requested mold test, and therefore cannot serve as a basis for alleging a failure to provide a reasonable accommodation.

Regarding plaintiffs' requests to be transferred to a new apartment or a first-floor unit in Malory Apartments, plaintiffs began texting and emailing Stalkfleet about smelling smoke and the presence of mold in their unit on Friday, September 8, 2023. Stalkfleet offered to show them alterative apartments on Monday, September 11, 2023. Doc. 63-2 at 9, ¶ 27. He showed them three units on that date, with Waypoint caseworker Simms. Doc. 68-1 at 16-17, ¶ 66. Plaintiffs rejected each unit claiming they all smelled like smoke. Doc. 63-2 at 10, ¶ 30. After Stalkfleet and Sims disagreed with plaintiffs regarding the smoke smell, plaintiffs called Stalkfleet a "horrible person, a liar" and said, "his mother did not raise [him] right and that she raised a despicable person." *Id.* at ¶ 31. After Simms tried to intervene, plaintiffs accused her of enabling Stalkfleet's behavior and called her incompetent. *Id.* Stalkfleet then agreed to plaintiffs' proposal to remain in their unit at Malory Apartments until September 30, 2023, while they looked for alternative housing options. Stalkfleet informed them that if they vacated their unit

on or before September 30, 2023, with no damages, plaintiffs would receive their full security deposit back and not have to pay the lease break fee. *Id.* at 105-06.

Defendants continued to attempt to show plaintiffs other apartments. Plaintiffs either rejected the apartments or failed to show up for the tours. Indeed, plaintiffs did not show up for their scheduled tour at Cedar Terrace Apartments on September 12, 2023. Doc. 63-2 at 11, ¶ 33. Nonetheless, on September 15, 2023, Stalkfleet showed plaintiffs three other units in Malory Apartments, including a first-floor unit. Stalkfleet opened the windows in two of these units (second floor unit 2804-15 and third floor unit 1606-9) upon Elizabeth's request and instructed Hale to put an ozone air purifying machine in unit 1606-9 as she thought the apartments smelled like smoke. Doc. 68-1 at 19, ¶ 73. After these tours, no agreement was made with plaintiffs. As such, Stalkfleet offered to meet with them on September 18, 2023, so they could look at the two units again after they were aired out. *Id.* at 21, ¶ 76. Stalkfleet sent plaintiffs three messages on September 18, 2023, trying to arrange a time to meet. They did not respond. Instead, Elizabeth emailed Stalkfleet the next day stating that her and Nicole would be filing a federal housing lawsuit against him and Nest. *Id.* at 22, ¶ 78.

Ultimately, on October 10, 2023, plaintiffs amended their lease to immediately transfer to Unit E1 at Cedar Terrace Apartments. Doc. 63-2 at 64-65. Therefore, plaintiffs' contention that they were not granted a reasonable accommodation regarding their requests to move is frivolous. Defendants went above and beyond any legal standard in their attempts to accommodate plaintiffs. Defendants offered plaintiffs multiple tours of available apartments—including a first-floor unit—allowed them to terminate their lease early and continued to offer alternative solutions even after plaintiffs accused them of legal malfeasance. Plaintiffs' contention that their request to transfer apartments was denied contradicts the undisputed factual record.

Finally, plaintiffs contend that defendants denied their request for the purchase and installment of fresh air sensors for the entire Malory Apartment complex.[12] Doc. 78 at 10. Stalkfleet reported that plaintiffs asked him to install fresh air sensors in the Malory Apartments. Doc. 68-1 at 15, ¶ 62. Assuming defendants denied the request, plaintiffs have not put forth any evidence showing that the installation of fresh air sensors across the entire complex was reasonable or necessary. Indeed, a plaintiff must make a prima facie showing that the requested accommodation is "reasonable on its face." *One Love Hous.*, 93 F.4th at 432. Further, plaintiffs must show that such an accommodation is "necessary (or indispensable or essential) to achieving the objective of equal housing opportunities between those with disabilities and those without." *Id.* at 433 (quotations omitted) (citations omitted). Plaintiffs provided no evidence regarding the utility of fresh air sensors—their function, effectiveness or cost—thus plaintiffs cannot sustain a claim that defendants' failure to purchase and install them violated the FHA.

Regarding Unit E1, plaintiffs allege that they requested expedited window screens and asked for their central air unit to be cleaned and disinfected. Doc. 78 at 15. These are not cognizable reasonable accommodation requests. The FHA states that discrimination can include "a refusal to make reasonable accommodations in rules, policies, practices or services." 42 U.S.C. § 3604(f)(3)(B). Courts have found that a "request for (re)construction or repair is more appropriately a request for a modification than an accommodation" and therefore is not actionable under the FHA. *Weiss v. 2100 Condo. Ass'n, Inc.*, 941 F. Supp. 2d 1337, 1344-45 (S.D. Fla. 2013) (collecting cases). As such, plaintiffs' requests for window screens and the cleaning and disinfection of their central air unit fail as a matter of law.

Additionally, plaintiffs contend that they asked Morrow to "us[e] an alternative insecticide." Doc. 78 at 12; *see also* Doc. 63-2 at 158 (email from October 14, 2023,

---

[12] Plaintiffs also requested that these sensors be installed in the Cedar Terrace Apartment complex. This same reasoning applies to that claim.

stating "we need to have you use one of the products I'm sending you a picture of"). There is no evidence that this request was denied. Indeed, Stalkfleet stated that he informed Housing Inspector Brian Hornung on October 18, 2023, that he would coordinate with Nest's pest control about potential alternative treatment options. Doc. 68-1 at 35, ¶¶ 125-26. Five days after plaintiffs asked Morrow to use a different insecticide, they informed Stalkfleet of their intention to move back into Unit 2804-24. *Id.* at 33. Assuming without deciding that a denial of the use of a particular insecticide could amount to a violation, plaintiffs did not provide any evidence that the use of an alternative insecticide was denied.[13]

Finally, plaintiffs allege that they requested to be transferred to a new unit and then back to Unit 2804-24 on October 14, 2023. *See* Doc. 63-2 at 25-26, 159. Again, they provided no evidence that their request was denied. In any event, and as a matter of law, plaintiffs' request to move into a new apartment was not reasonable. Defendants had already moved plaintiffs to a new unit just three days earlier and plaintiffs failed to vacate their prior residence. Indeed, defendants went to great lengths to accommodate and relocate plaintiffs from Unit 2804-4. As noted above, Stalkfleet showed plaintiffs three units on September 11, 2023 (four days after they moved into Unit 2804-24), three more on September 15, 2023, and offered to show plaintiffs' additional options on September 18, 2023. In addition, Stalkfleet investigated their neighbors' units, whom plaintiffs accused of smoking (and found no evidence of such), and Stalkfleet permitted plaintiffs to vacate their unit on September 30, 2023, waiving the lease break fee.

Additionally, plaintiffs refused to move out of Unit 2804-24 after they moved into Unit E1. Doc, 63-2 at 28, ¶ 81-82. On October 11, 2023, Stalkfleet asked Elizabeth

---

[13] Actual denial is not required as courts recognize constructive denial by unreasonable delay. Although this is "highly fact-specific and is made on a case-by-case basis," I am not aware of any case, nor do the parties cite any, in which court found that a delay of a few days constituted a constructive denial. Instead, courts generally require one year or more to pass from the time that a request is made to establish a constructive denial. *Logan v. Matveevskii*, 57 F. Supp. 3d 234, 267 (S.D.N.Y. 2014) (collecting cases where courts found a constructive denial).

when she would be returning their keys for Unit 2804-24. Instead of answering his question, she responded with the obnoxious email that started by calling Stalkfleet "a vile and despicable corrupt 'asset manager'" and stating that they would "give you the keys when we are done." *Id.* at 156. Plaintiffs knew Unit E1 had a history of cockroaches,[14] which Nest was attempting to remedy, when they moved into it. Doc. 68-1 at 35, ¶ 125. They cannot create or exacerbate the conditions they now complain of and turn those conditions into an FHA violation. Given the steps defendants took to try to find plaintiffs a new apartment, plaintiffs' knowledge that Unit E1 had a cockroach problem and their failure to vacate Unit 2804-24, plaintiffs' request to be moved four days after moving into Unit E1 was not, as a matter of law, reasonable or necessary to afford handicapped persons an equal opportunity to use and enjoy a dwelling.

Plaintiffs also allege that the defendants failed to engage in the interactive process with them. *See* Doc. 78 at 10, 12-13, 18-19. The Eighth Circuit has held that liability is not imposed "merely for failing to fulfill this procedural aspect of the duty to reasonable accommodate." *Peebles v. Potter*, 354 F.3d 761, 769 (8th Cir. 2004). Because the accommodations plaintiffs requested were either unreasonable, unnecessary or not supported by the factual record, I need not consider plaintiffs' arguments regarding the interactive process. *Id.* at 769-70 ("Because we have held, as a matter of law, that the accommodation [plaintiff] requested was unreasonable, 'any discussion concerning the interactive process under these facts is superfluous.'") (quoting *Dropinski v. Douglas Cnty., Neb.*, 298 F.3d 704, 710 (8th Cir. 2002)).

For all of the reasons set forth above, defendants are entitled to summary judgment as to all of plaintiffs' FHA reasonable accommodation claims.

---

[14] Before moving into Unit E1, plaintiffs were told the apartment had a "cockroach problem" (Doc. 4 at 13) and they found a cockroach in the kitchen during the inspection (Doc. 68-1 at 30). Nonetheless, they signed off on the condition of the unit and inhabited it.

### b. FHA – Retaliation

Plaintiffs allege that defendants retaliated against them in violation of the FHA by: (1) "threatening unlawfully to terminate doing business with Waypoint" and ultimately evicting them after they filed reasonable accommodation requests and formed a tenant's union and (2) issuing a lease violation notice because they requested to reschedule the inspection of plaintiffs' unit, called the CRPD on their neighbors and formed a tenant's union. Doc. 78 at 29, 31.

The FHA "prohibits retaliation against any person on account of his having exercised or enjoyed a right granted or protected by the FHA." *Gallagher v. Magner*, 619 F.3d 823, 838 (8th Cir. 2010) (citing 42 U.S.C. § 3617). Specifically, this statute makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed. . . any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. Unlawful conduct under this section includes "[r]etaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act." 24 C.F.R. § 100.400(c)(5). "To state a claim for retaliation under the FHA, Plaintiff must show: (1) [he] engaged in a protected activity; (2) Defendant was aware of the activity; (3) Defendant took adverse action against [the plaintiff]; and (4) there is a causal link between the adverse action and the protected activity." *United States v. Edmunds*, No. 15-CV-2705, 2016 WL 7670605, at *4 (D. Minn. Dec. 6, 2016), *report and recommendation adopted*, 2017 WL 102964 (D. Minn. Jan. 10, 2017).

At the outset, plaintiffs cannot prevail on their FHA retaliation claims because, as a matter of law, they failed to establish that they are handicapped within the meaning of the statute. *See supra* Section V.A.2a.1. However, even assuming plaintiffs are handicapped, they have failed to create a genuine issue of material fact regarding the alleged retaliation.

Plaintiffs allege that they engaged in the following protected activities: requesting a reasonable accommodation, forming a tenant's union, requesting to reschedule the inspection of Unit 2804-24 and calling the CRPD on their neighbors. "Protected activity can include requesting a reasonable accommodation, protesting discriminatory housing practices, or opposing practices the plaintiff reasonably and in good faith believed amounted to discriminatory housing practices." *Lee v. Omaha Hous. Auth. Found. Inc.*, No. 24-cv-203, 2025 WL 588030, at *4 (D. Neb. Feb. 24, 2025) (citation omitted).

Plaintiffs' calls to the CRPD and requests to reschedule the inspection of their apartment are not protected activities. As noted above, plaintiffs called the CPRD on three occasions to report marijuana or chemical smells coming from either Djanashvili's or Holt's apartment. *See* Doc. 68-1 at 22-24. The CRPD found no evidence to substantiate any of plaintiffs' claims. *Id.* Repeatedly calling the police to make baseless claims about one's neighbors is not an FHA-protected activity. Regarding the inspection rescheduling, plaintiffs offered no evidence that they even made such a request or that such request was related to their handicap. Indeed, requesting to reschedule a routine property inspection is typically a logistical or contractual issue—not a civil rights matter.

As for plaintiffs' claim that they attempted to form a tenant's union, the record contains no supporting evidence. Plaintiffs posted a letter on their neighbors' doors at Malory Apartments on or about October 12, 2023.[15] Doc. 68-1 at 38, ¶ 133. The letter encouraged tenants to stop smoking in their apartments and informed tenants that Nest would not purchase fresh air sensors but did not even hint at the possible formation of a tenants' union. Doc. 63-3 at 7; *see also supra* Section III.C.2d. Nor have plaintiffs

---

[15] Additionally, plaintiffs placed a note on a prospective tenant's vehicle on November 7, 2023, while she toured an apartment at the Cedar Terrace complex. It stated, "This place is full of cockroaches. Don't rent here. They are racist against black people. Go anywhere else not here." *Id.* at 39, ¶ 138. Plaintiffs did not provide any evidence showing they reasonably or in good faith believed that Cedar Terrace Apartments management was racist or engaging in racist conduct. Plaintiffs cannot assert that an apartment complex is racist without any evidence or justification and then claim protection under the guise of it being a "protected activity."

30

provided other evidence suggesting that they attempted to form such a union. Thus, while I will assume that posting the letter could amount to protected activity, it does not support plaintiffs' claim that they sought to form a tenants' union.

Requesting a reasonable accommodation is a protected activity. However, I have determined as a matter of law that none of plaintiffs' requested accommodations were reasonable or supported by the factual record. Nonetheless, assuming that plaintiffs' reasonable accommodations requests qualify as protected activities, defendants knew that plaintiffs posted a letter on all the doors at the Malory Apartment complex and knew about their reasonable accommodation requests. Thus, I will consider whether defendants took adverse action against plaintiffs.

Plaintiffs allege the following adverse actions: threatening to stop working with Waypoint, evicting them and giving them a lease notice violation. "An adverse action under § 3617 is conduct that a reasonable person would view 'as coercive, intimidating, threatening, or interfering with the exercise of her protected right under the FHA.'" *Kris v. Dusseault Fam. Revocable Tr.*, 594 F. Supp. 3d 333, 341 (D.N.H. 2022) (quoting *Geraci v. Union Square Condo. Ass'n*, 891 F.3d 274, 277 (7th Cir. 2018)).

Regarding defendants' alleged threat to Waypoint, on October 13, 2023, Nest informed Waypoint's J'nae Peterman of the ongoing harassment from plaintiffs and stated that it would stop working with Waypoint if the situation was not resolved. Doc. 68-1 at 35. Nest informed Waypoint of the following challenges posed by plaintiffs:

- harassment of neighbors
  - including baseless calls to the police, delivering letters, taking pictures of neighbors, verbal altercations in the middle of the night
  - verbal altercations including threatening to call DHS and CPS on their neighbors related to their baseless claims. Also includes verbal altercations with police officers on property.
- harassment of nest property management employees
  - continued harassment via email, phone calls, texts and in person. Including berating and defaming employees, recording conversations without permission, aggressively pursuing employees on property

31

- denial of entry to unit for inspection
  - violated lease by denying owner access to the unit despite providing more than 24 hour written notice refusal. . .
- refusal to turn in keys for unit
  - resident intentionally holding over previous unit by keeping their dogs there and have refused to turn in keys in a timely manner

Doc. 63-2 at 24-25, ¶ 67. Considering the undisputed facts, there is no genuine dispute that defendants' admonition to Waypoint was coercive, sought to intimidate or otherwise interfere with plaintiffs' exercise of a protected right under the FHA. None of the reasons Nest provided concerned any protected activities by plaintiffs. Instead, the violations related to plaintiffs' relentless and obnoxious harassment of their neighbors and Nest employees, and their refusal to comply with the property management's rules.

Additionally, although evictions are typically considered adverse actions, plaintiffs cannot establish that their eviction here qualifies. The Iowa District Court held that plaintiffs' eviction was not retaliatory. *See* Doc. 63-3 at 107 ("Defendants simply have failed to offer any specific evidence to show retaliatory behavior"). This determination has a preclusive effect on plaintiffs' FHA retaliation claim, which is based on the same eviction. *See Kvalvog v. Park Christian Sch., Inc.*, 66 F.4th 1147, 1152 (8th Cir. 2023) ("The *Rooker-Feldman* doctrine provides that, with the exception of habeas corpus petitions, lower federal courts lack subject matter jurisdiction over challenges to state court judgments."). Therefore, plaintiffs cannot maintain a retaliatory eviction claim. *See Young v. Jackson*, 417 Fed. App'x 592, 594 (8th Cir. 2011) (unpublished) (state-court judgment upholding eviction in favor of subsidized apartments had preclusive effect on FHA retaliation claim which was based on same eviction, and therefore the district court properly dismissed plaintiff's FHA claim); *see also Banks v. Int'l Union Electronic, Electrical, Tech., Salaried & Mach. Workers*, 390 F.3d 1049, 1052-53 (8th Cir. 2004) ("[W]here a plaintiff fashions a new theory of recovery or cites a new body of law that was arguably violated by a defendant's conduct, res judicata will still bar the second claim if it is based on the same nucleus of operative facts as the prior claim.").

32

Finally, plaintiffs contend that the denial of their reasonable accommodation requests was an adverse action. This argument is frivolous. Alleged denials of reasonable accommodation requests must be brought as disability discrimination claims and I have denied those claims. Plaintiffs cannot now repackage the same grievance as a retaliation claim to get a second bite at the apple. Defendants are entitled to summary judgment on plaintiffs' retaliation claims.

### c.    *Rehabilitation Act § 504*

Section 504 of the Rehabilitation Act (RA) provides that "[n]o otherwise qualified individual with a disability. . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The RA defines "program or activity" to include "all of the operations of – a department, agency, special purpose district, or other instrumentality of a State or of a local government." § 794(b). The enforcement, remedies, and rights are the same under both Title II of the Americans with Disabilities Act and § 504, although the RA contains the additional requirement that the plaintiff show the program or activity from which he is excluded receives federal financial assistance. *See Gorman v. Bartch*, 152 F.3d 907, 911 (8th Cir. 1998) ("[C]ases interpreting either [the ADA or RA] are applicable and interchangeable[.]") (citation omitted). To state a claim, a plaintiff must show that "(1) he is a qualified individual with a disability; (2) he was denied the benefits of a program or activity of a public entity which receives federal funds, and (3) he was discriminated against based on his disability." *Id.*; *see also Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999). The RA "require[s] public entities to make reasonable accommodations to ensure meaningful access to the benefit that public entity provides." *Arc of Iowa v. Reynolds*, 638 F. Supp. 3d 1006, 1020 (S.D. Iowa 2022). As an affirmative defense, a defendant may demonstrate that the requested accommodation would constitute an undue burden. *See Gorman,* 152 F.3d at 911.

33

Plaintiffs appear to assert a RA claim against all defendants—claiming that their failure to provide reasonable accommodations violates § 504. Doc. 78 at 14. Plaintiffs allege the same reasonable accommodations under § 504 as they did under the FHA. *Id.* Courts have found that because:

> [t]he relevant portions of the FHA, ADA, and Section 504 of the Rehabilitation Act offer the same guarantee that a covered entity, such as a public housing authority, must provide reasonable accommodations in order to make the entity's benefits and programs accessible to people with disabilities, analysis of a reasonable accommodation claim under the three statutes is treated the same.

*Logan v. Matveevskii*, 57 F. Supp. 3d 234, 253 (S.D.N.Y. 2014) (collecting cases) (quotations omitted). Nonetheless, the *Logan* court noted differences between the FHA and the RA: (1) the RA only applies to federal-funded programs, (2) disabled might have a broader meaning under the RA than handicapped under the FHA, (3) the FHA is limited to statutorily defined dwellings, and (4) the FHA only applies to housing discrimination claims whereas the RA has a broader scope. *Id.* at 254-55.

These distinctions are immaterial here. First, plaintiffs allege, without providing proof or any citations to the appendix, that "Defendants accept federal housing dollars from the United Staes Department of Treasury." Doc. 78 at 14. Moreover, assuming without deciding that they can make a claim under the RA, the RA's broader definition of disability is of no consequence as plaintiffs provided no evidence of their disabled status, which is again fatal to their claims.[16] Finally, plaintiffs' § 504 claims all relate to housing, such that the RA's broader scope is immaterial. As the differences between the FHA and the RA are irrelevant in this case, my findings regarding plaintiffs' reasonable

---

[16] The RA adopts the definition of disability used by the ADAA. *See* 42 U.S.C. § 12102(1) and 29 U.S.C. § 794. The ADA was amended in 2008. Because the FHA was not similarly amended, a finding of disability under the RA is made by reference to pre-2008 ADA cases. *See supra* n.12. In any event, the ADAA uses the same definition of disability as adopted by the FHA but contains additional guidance regarding construing the definition of disability broadly and how the concept of "substantially limits" should be interpreted. *See* 42 U.S.C. § 12102(4).

accommodations claims under the FHA apply to this claim as well. Defendants are entitled to summary judgment on plaintiffs' § 504 claims.

### d. State Law Claims

Based on their complaint, plaintiffs appear to assert state law claims under Iowa Code §§ 562A.15, 562A.19, 562A.21, 562A.23, 562A.27B and 562A.35, along with common law claims under Iowa law for breach of contract, violation of privacy, breach of warranty of habitability and quiet enjoyment. Based on their summary judgment resistance, plaintiffs may have waived or abandoned many of these claims.[17] I need not address that issue, however, because all of the federal claims in this case are being dismissed and I will decline to exercise supplemental jurisdiction over any remaining, state law claims.

When a federal court dismisses all claims arising under federal law, it "may decline to exercise supplemental jurisdiction over" related state-law claims that form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367(c); *see also In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1060 (8th Cir. 2018) ("Congress unambiguously gave district courts discretion in 28 U.S.C. § 1367(c) to dismiss supplemental state law claims when all federal claims have been dismissed."). Although not mandatory, "in the usual case in which all federal-law

---

[17] For example, plaintiffs made no mention of Iowa Code §§ 562B.32, 562A.15, 562A.21, 562A.23, 562A.27B or 562A.35 in their summary judgment filings. *See* Doc. 78. Nor did they present any arguments related to their breach of contract or violation of privacy claims. *Id.* As such, any arguments in support of these claims have likely been waived. Moreover, plaintiffs attempt to assert claims related to Iowa Code § 562A.36 in their summary judgment filings. *See* Doc. 78 at 28, 44. However, they did not include this claim in their complaint (Doc. 4) and cannot assert a new claim in the course of resisting a motion for summary judgment. *See, e.g.*, *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

35

claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). I find that these factors weigh against this court's continued exercise of supplemental jurisdiction over the plaintiffs' state law claims. Those claims will be dismissed without prejudice.

**B.     *Plaintiffs' Motion to Dismiss***

A voluntary dismissal under Rule 41(a)(1) is not permissible because the defendants have filed a motion for summary judgment. As such, plaintiffs seek an order under Rule 41(a)(2) to voluntarily dismiss their complaint without prejudice because of their "ongoing physical and mental health disabilities."[18] Doc. 55 at 1. This motion will be denied. To grant a dismissal at this point would not advance the goal of securing "the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. The defendants prepared and filed a motion for summary judgment and have invested significant resources into this case. *Cf. Mullen*, 770 F.3d at 728 (finding that a "grant of voluntary dismissal did not result in a waste of judicial time and effort, because the case had not progressed very far" as "the case was still in the early stages of discovery"); *see also Hamm v. Rhone-Poulenc Rorer Pharm. Inc.*, 176 F.R.D. 566, 571 (D. Minn. 1997), *aff'd sub nom. Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941 (8th Cir. 1999) (denying plaintiffs' request for voluntary dismissal as it would waste the substantial efforts expended by the magistrate judge and this court and prejudice the

---

[18] Despite plaintiffs alleged hardships, they filed 23 documents, including 16 new motions after filing their motion (Doc. 55) to dismiss. Many of these motions were quite lengthy. *See, e.g.*, Doc.74 (54 pages); Doc. 78 (48 pages); Doc. 89 (26 pages). Considering these lengthy and frequent filings, plaintiffs' argument that they were physically unable to continue pursuing their case is clearly false.

defendants by depriving them of a valid defense). Plaintiffs are not entitled to dismiss this case at this stage to "escape an undesirable outcome." *Graham*, 998 F.3d at 803.

## C.    *Plaintiffs' Motion for Appointment of Counsel*

Plaintiffs are not incarcerated, nor have they demonstrated an inability to retain counsel. Additionally, they are experienced pro se litigants, specifically in cases of this nature. *See, e.g.*, *Fedynich v. Lozano*, No. 3:20CV260, 2021 WL 710368 (E.D. Va. Feb. 23, 2021) (plaintiffs brought eight counts against defendants, including claims for violations of the FHA, RA, retaliation and constructive eviction); *Fedynich v. Boulder Hous. Partners*, No. 3:20CV165 (DJN), 2020 WL 5371352 (E.D. Va. Sept. 8, 2020) (plaintiffs sued defendants under the FHA for their alleged failure to provide reasonable accommodations; they also sued under the RA); *Fedynich v. Inn Between of Longmont*, No. 17-CV-01952, 2018 WL 4345190, at *1 (D. Colo. June 1, 2018), *report and recommendation adopted*, 2018 WL 3868705 (D. Colo. Aug. 15, 2018) (plaintiffs brought FHA claims against defendants for their alleged failure to provide reasonable accommodations and retaliation). As such, their motion (Doc. 89) and amended motion (Doc. 97) for the appointment of counsel is **denied**.

## VI.    CONCLUSION

For the reasons stated herein:

1.    Defendants' motion (Doc. 60) for summary judgment is **granted** as to all claims brought pursuant to federal law (specifically, the Fair Housing Act and the Rehabilitation Act). Those claims are hereby **dismissed with prejudice**.

2.    Plaintiffs' "counterclaim" for summary judgment (Doc. 78) is **denied**.

3.    Because the court declines to exercise supplemental jurisdiction over plaintiffs' state law claims, all such claims are **dismissed without prejudice**.

4.    Plaintiffs' motion (Doc. 55) to dismiss is **denied**.

5.    Plaintiffs' motions (Docs. 89, 97) to appoint counsel are **denied**.

37

6.      Plaintiffs' motion (Doc. 59) for a hearing and motion (Doc. 70) for an expedited determination are **denied as moot**.

7.      The following non-parties who are mistakenly listed on the docket for this case are hereby **stricken** from the docket:  Cedar Terrace Holdings LLC, Ellis Ave, LLC, James St, LLC, Nest Team Investments, LLC and DJC Property, LLC.

8.      Pursuant to Federal Rule of Appellate Procedure 4(a)(1), parties wishing to appeal a judgment in a civil case must file a notice of appeal "with the district clerk within 30 days after entry of the judgment or order appealed from."  The Clerk's office is directed to send plaintiffs a copy of Form 1A from the Appendix of Forms from the Federal Rules of Appellate Procedure.

9.      Because this order disposes of all claims asserted in the complaint, the Clerk of Court shall **close this case**.


        **IT IS SO ORDERED** this 20th day of May, 2025.


                                        _____
                                        Leonard T. Strand
                                        United States District Judge